IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BARBARA TAYLOR, o/b/o ) | | |
| DEBRA DISMUKES ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | CIVIL ACTION NO. 1:04cv917-M | |
| ) | [WO] | |
| JO ANNE B. BARNHART, ) | | |
| Commissioner of Social Security, ) | | |
| ) | | |
| Defendant. ) | | |

**MEMORANDUM OPINION AND ORDER**

Claimant Barbara Taylor ["Taylor"] filed this action on behalf of Debra Dismukes ["Dismukes"], now deceased, seeking review of a final decision by the Commissioner of Social Security ["Commissioner"] (Doc. # 1) pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) (2004). Upon review of the record and the briefs submitted by the parties, the court concludes that the Commissioner's decision should be reversed and remanded.

**I.  FACTS AND PROCEDURAL BACKGROUND**

According to her medical records, Dismuke's relevant complaints began as early as November 1984, when she was seen by a Dr. Hanson for what she then described as "toothache pain" in her legs. (R. 96). Approximately two years later, she was again seen for leg pain, this time in her knees, and she complained of pain in her left hip

region (R. 95).[1]  Trochanteric bursitis was suspected but not definitively diagnosed. (R. 95).

In August 1987 Dismukes again sought help for her leg and hip pain. (R. 93-94). At the time, she complained that it was painful to sit for very long, but motion caused only a "little bit of discomfort" (R. 94). She was placed on a weight loss program, and her next visit did not occur until February 1989, when she again complained of leg and hip pain. (R. 92). Again, her weight, 236 pounds, was considered a factor, and, though hip tenderness was noted, x-rays revealed only "perhaps a little early medial compartment arthritis" (R. 91) but no "arthritic changes." (R. 92). She had experienced no problems since 1987. *Id.*

Later in 1989, Dismukes was seen by Dr. Paulk for "abnormal vaginal bleeding" accompanied by cramps (R. 157). Her blood pressure was high (150/110), and Dr. Paulk noted that she had not been compliant with treatment. *Id.* Several times in 1992, she was seen for blood pressure checks, and she was diagnosed with hypertension (R. 155-57). She also complained of frequent headaches and dizziness, which Dr. Mark F. Dean attributed to her high blood pressure. *Id.*

In January 1994 she complained of "pain in her left side which began over [her] iliac crest" and radiated to "her left CVA area" (R. 155). She also complained of gas and nausea, and treatment was limited to prescription medications. *Id.* In November the same year, she sought help for pain on her left side, and she was given an injection into her bursal region (R. 92). Dr. Hanson noted her "need to lose some weight". *Id.*

---

[1] Notably, when she was 12, Dismukes underwent pin placement surgery for "bilateral slipped capital femoral epiphysis" (R. 93). Pins were placed in both hips, and the one in her right side was eventually removed. (R. 91-93).

2

Her next doctor's visit took place in February 1997,[2] when she again sought treatment for pain in her left side and in her knees. (R. 90). She was seen twice later that year with similar complaints (R. 89). Tests administered "may [have] show[n] some mild early degenerative arthritis medially but that is it" (R. 89, 90). A subsequent CT scan of her pelvis revealed nothing remarkable, but an MRI of her right knee indicated "mild medial joint space narrowing suggesting some early degenerative arthritis." (R. 97). "Minimal spurring of the inferior pole of the patella" was noted, and Dismukes had some difficulty "getting up after standing" (R. 89, 90). The pin that remained in her hip was not protruding through the bone, and removal would not have helped. *Id.* In December 1997, her blood pressure was 170/60, but she had "not been taking" the medicine prescribed to relieve her hypertension (R. 158). Her blood sugar was also up, and Dr. Dean prescribed diabetes classes. *Id.*

In February 1998, Dr. Dean noted a history of diabetes mellitus, though this history is not well documented (R. 154). Although her blood sugar was low at the time of her visit, Dismukes noted that it had been elevated occasionally, but she also stated that "she hasn't been checking her BS regularly." *Id.* Dr. Dean's initial impression was type II diabetes mellitus. *Id.* She also complained of headaches and high blood pressure (R. 158).

From early 1998 through 2001, Dismukes' doctor visits became more frequent. After

---

[2] Records from a visit to Women's Healthcare, P.C., in June 1998 note a "history of fibroids" and indicate that an otherwise unidentified Dr. Crump performed a "myomectomy in 1996" (R. 141). "A year later because of pain [sic], he performed a laparoscopy and found a 'cyst' on the left ovary and found that the left tube as [sic] 'blocked.'" *Id.* At her evidentiary hearing, both the ALJ and her attorney expressed "frustration" at finding that medical records had not been provided despite Dismukes' claims that the record was complete. (R. 315-16; 321-22).

her February visit, Dismukes was diagnosed with "uterine fibroids", and "anemia" was noted, though "[t]his is almost certainly due to blood loss with her periods" (R. 141-42). She declined "definitive treatment" for the fibroids, which would have meant a hysterectomy, and opted instead for a myomectomy, which is removal of the fibroids. (R. 142). In August 1998, she underwent surgery, which included an exploratory laparotomy, myomectomy, left salpingo-oophorectomy (removal of the fallopian tube and ovary), and an appendectomy. (R. 98-106; 130-47; 149). In November of that year, after doing well following surgery, she was prescribed medicine for lower abdominal pain (R. 137).

Throughout 1999 she was treated for a variety of problems, including colds, abdominal pain, headaches, dizziness and continued high blood pressure (R. 110-15). Another fibroid was also detected (R. 136).

In August 2000, Dismukes again underwent an exploratory laparotomy and a myomectomy, during which nine fibroids were removed (R. 116). She wad diagnosed with pelvic pain, uterine fibroids, menorrhagia, and severe pelvic adhesive disease, *id.*, and her condition improved after the procedure (R. 130). Again, anemia was noted, but this condition, to which no symptoms were attributed, appeared treatable with iron supplements (R. 130).

In October 2000, her blood sugar was elevated and poorly controlled, though she claimed to have adhered to her dietary restrictions (R. 153). She also complained of pain in her knee. *Id.* In December, she complained of knee pain again, as well as headaches and high blood pressure. *Id.* Her headache was thought to be due to a sinus infection (R. 151).

In January 2001, Dr. Michael R. Obrien noted complaints of pain in her "left flank" that

was associated with nausea. (R. 150). He also noted that her blood pressure and blood sugar, both of which were elevated, were poorly controlled. *Id.* In May 2001, she was admitted to the hospital for hypertension and chest pain. (R. 159-208). Her blood pressure was elevated, but her

> blood work was unremarkable except for elevated sugar at 302. . . . . She is noted to be anemic, and she does have quite heavy periods. Her vital signs remained stable. She had no chest pain or discomfort additionally. She was discharged home on her routine medications.

(R. 159). Her anemia was noted to be "significant[]" (R. 161). Her trouble with her blood sugar and blood pressure continued, and her failure to comply with treatment was noted as was the fact that she could not afford her medication. (R. 209-19).

Following this, in 2002, Dismukes was seen only once for a consultative exam, which resulted in a diagnoses of congenital hip defects, diabetes mellitus and hypertension. (R. 220-223). In early 2003, Dr. Parks noted that pain on the right side of her body was not likely arthritic and may be due to fibromyalgia. (R. 232-34).

Dismukes initially filed for disability benefits approximately one month after being fired from her job as a shirt inspector at Van Huesen in December 2000, despite collecting unemployment benefits and continuing to look for work for 26 weeks following her termination (R. 42-44; 308; 310). Her application was denied, and she did not appeal the determination (R. 25-26; 45-46).

Instead, she filed another application in November 2001 claiming she was disabled due

to high blood pressure, diabetes, arthritis, "scoliosis in back" and obesity (R. 72).[3] Her application was denied initially and upon reconsideration (R. 27-28; 38). A hearing before the ALJ resulted in an unfavorable decision, and the Appeals Council ["AC"], after considering additional medical evidence Dismukes submitted, nonetheless denied her request to review the ALJ's decision. (R. 5-7). Thus, the ALJ's decision became the final decision of the commissioner. Dismukes died approximately two months before the AC denied review on 3 August 2004, and Taylor filed this timely lawsuit on 29 September 2004.

## II.  STANDARD OF REVIEW

The district court's review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." ***Miles v. Chater***, 84 F. 3d 1397, 1400 (11th Cir. 1996) (citing ***Bloodsworth v. Heckler***, 703 F.2d 1233, 1239 (11th Cir. 1983)). The court must affirm the Commissioner's decision "if it is supported by substantial evidence and the correct legal standards were applied," ***Kelley v. Apfel***, 185 F.3d 1211 (11th Cir. 1999) (citing ***Graham v. Apfel***, 129 F. 3d 1420, 1422 (11th Cir. 1997)).[4] This is true despite the fact that "[s]ubstantial

---

[3] In a State supplement to her disability report, she also listed "degenerative disc in upper back," "fibroid cysts in uterus," and "headaches." (R. 69-70).

[4] In ***Graham v. Apfel***, 129 F. 3d at 1422, the Court of Appeals stated that:

> Substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. ***See Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

evidence may even exist contrary to the findings of the ALJ." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid." *Miles*, 84 F. 3d at 1400 (citations omitted).

### III.   DISCUSSION

#### A.   *Standard for Determining Disability*

An individual who files an application for Social Security disability benefits must prove that he is disabled. *See* **20 C.F.R. § 416.912 (2004)**. The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A) (2004)**.

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven that he is disabled. *See* **20 C.F.R. § 416.920**. The ALJ must evaluate the claimant's case using this sequential evaluation process, *Ambers v. Heckler*, 736 F.2d 1467, 1469 (11th Cir. 1984); *Williams v. Barnhart*, 186 F. Supp. 2d 1192, 1195 (M.D. Ala. 2002). The steps are as follows:

1. If the claimant is working or engaging in substantial gainful activity, he is not disabled. However, if the claimant is not working or engaging in substantial

gainful activity, the court must consider whether the claimant has a severe impairment.

2. If the claimant does not have a severe impairment, he is not disabled. A severe impairment is defined as a condition that precludes one from performing basic work-related activities. If the claimant has a severe impairment, the court must then consider whether the impairment has lasted or is expected to last for more than 12 months.

3. If a claimant's impairment has lasted or is expected to last for a continuous period of 12 months or more and it is either included on or equivalent to an item in a list of severe impairments, as found in Appendix I of the regulations, the claimant is disabled. If neither of the above conditions, when considered in association with the continuity requisite of 12 months, is deemed true, the ALJ must go on to step four of the evaluation sequence.

4. If it is determined that the claimant can return to previous employment, considering his residual functional capacity ["RFC"] and the physical and mental demands of the work that he has done in the past, the claimant will not be considered disabled. If it is determined that the claimant cannot return to previous employment, the SSA must continue to step 5 in the sequential evaluation process.

5. If, upon considering the claimant's RFC, age, education, and past work experience, the SSA determines that the impairments determined do not

preclude the claimant from performing a significant number of jobs that are available in the national economy, the claimant will not be considered disabled within the meaning of the Social Security Act. Therefore, she/he will not be entitled to benefits pursuant to 42 U.S.C. §§ 401 *et seq.* and/or 42 U.S.C. § 1381. If, however, it is determined that there are not a significant number of jobs the claimant can perform available in the national economy and the impairment meets the duration requirement, the claimant will be considered disabled.

*See* §§ 20 C.F.R. 404.1520(a)-(f), 416.920(a)-(f).

### B.   *Application of the Standard: Dismukes' Testimony and the ALJ's Findings*

At the time of her administrative hearing, Dismukes was 42 years old, a high school graduate, and had worked as a shirt inspector for approximately 15 years. (R. 307-08). While employed with Van Heusen, she was required to lift 50 pounds frequently and crouch, kneel and crawl. (R. 308-09).[5] After losing her job in December 2000, and despite applying for disability benefits, Dismukes collected unemployment insurance benefits and continued to look for a job. (R. 310-11). She also admitted that, but for her firing, which she attributed to her medical problems, she would have continued working and lifting 50-pound bundles of shirts. *Id.*

---

[5] Her testimony on these matters conflicted with information she provided on her initial application. (R. 307-08).

Dismukes told the ALJ that she experienced pain in her hands, fingers, knees, shoulders and ankles (R. 311) and that she suffered from high blood pressure, arthritis and diabetes. (R. 318). After losing her job, Dismukes moved in with her mother, who "[did] all the cooking . . . [and] cleaning. And, when [she was] able, [she would] help fold clothes because [her] hands [did not] work so good." (R. 317). When asked whether there were any other problems she would like to tell the ALJ about, Dismukes responded:

> Yes, sir. My legs swell really bad, and in the morning when I get up, it takes me anywhere from an hour to two hours to really just - - to even really get out of bed because my legs are so swollen. My fingers hurt. I have to work my hands to get my fingers to goin [sic], and my shoulders, they swell. I'm just in pain all the time.

(R. 319). Nevertheless, she said she walked approximately one half mile daily, though her knees would swell up and walking would become difficult. (R. 314).

Noting that she suffered from obesity, diabetes mellitus, hypertension and hip defects, all of which he described as severe, the ALJ nonetheless found that Dismukes lacked credibility.

> The claimant's complaints of chronic debilitating pain and other symptoms are not credible. After listening to her testimony, observing her demeanor and evaluating said testimony in light of the objective medical records, it appears that the claimant is trying to make her symptoms sound significantly more severe than they actually are. The claimant's testimony is particularly suspect in light of the objective medical evidence, which simply does not establish that she has a medical impairment that could reasonably be expected to produce the degree of pain and other symptomatology alleged. In December 2000, x-rays were normal. She has no muscle atrophy or spasms. Dr. Pratt observed that her complaints of tenderness were unusual in

> pattern and presentation and inconsistent with a rheumatoid or inflammatory process. She has responded well to conservative treatment, as evidenced by her report that Relafen relieved her knee pain. The claimant's pain does not interfere with her capacity to maintain attention and concentration for extensive pleasure reading. The claimant's failure to be compliant with treatment for arthritis, diabetes and hypertension also casts doubt on her credibility. She has been encouraged to exercise. The only restriction of record proscribes heavy lifting. The fact that the claimant drew unemployment benefits for many months implies a willingness and readiness to work after she was laid off from her job.

(R. 21).

After reviewing the evidence in the record, the ALJ made the following additional findings:

> 1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant has an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b) [sic].
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6. The undersigned has carefully considered all of the

       medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the following residual functional capacity: She can lift 20 pounds occasionally, 10 pounds frequently; stand and/or walk 6 hours/day; sit 6 hours/day; never climb ladders or ropes; occasionally balance, stoop, kneel, crouch, and crawl; must avoid vibration and hazards, i.e. moving machinery and heights.

8. The claimant's past relevant work as spot cleaner did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

9. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

10. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F. R. §§ 40411520(e) and 416.920(e)).

## C. *Taylor's Arguments*

On Dismukes' behalf, Taylor contends generally that the ALJ's opinion is not supported by substantial evidence. Specifically, she contends that the ALJ erred

1. by ignoring an express limitation noted in the Residual Functional Capacity assessment completed by a State Disability Determination Services employee;

2. by failing to address Dismukes' anemia; and

3. by failing to consider the side effects of Dismukes' medication.

Taylor also contends that medical records provided to the AC after the ALJ decision was issued warrants remand (Doc. # 13). The court agrees that the ALJ's failure to discuss

Dismukes' well-documented anemia requires reversal and remand.[6]  The court nonetheless addresses Taylor's other arguments to the extent they are not consequently moot in an effort to avoid repetitive litigation.[7]

### D. RFC Assessment

Stating that the ALJ "rejected the only residual functional capacity assessment of record

---

[6]     The Commissioner contends that the ALJ was not obliged to discuss Dismukes' anemia because the condition was not noted in medical records produced after her initial application for benefits was denied.  "Because Plaintiff did not request reconsideration of that denial, the decision is administratively final and precludes further consideration of whether she was disabled prior to that date."  (Doc. # 17, p. 6).

The Commissioner's position is untenable.  While the ALJ might have been well advised to adhere to the principle of *res judicata* and limit his review accordingly, in fact, the ALJ did not limit his inquiry to whether Dismukes' condition had worsened since the previous decision.  Instead, he reviewed all of the records before him, including those forming the basis for the previous denial, for the sole purpose of determining whether Dismukes was disabled.  He did not review the records simply to determine whether *res judicata* applied, as in ***Cherry v. Heckler***, 760 F.2d 1186, 1189 (11th Cir. 1985).  Nor does the Commissioner contend that the regulations precluded him from dismissing the claim on *red judicata* grounds, as in ***Passopulos v. Sullivan***, 976 F.2d 642 (11th Cir. 1992).  By engaging in what amounts to a *de novo* review of the previous decision, he *de facto* reopened the previous case, and the court has jurisdiction to base its decision on the entire record before the ALJ without regard for the previous denial.  *See*, *e.g.*, ***Sherrod v. Chater***, 74 F.3d 243, 245 (11th Cir. 1996) ("Subject matter jursidiction will exist in those cases where 'a social security claim is in fact reopened and reconsidered on the merits to any extent on the administrative level,'" quoting ***Macon v. Sullivan***, 929 F.2d 1524, 1529 (11th Cir. 1991)).  The fact that he noted the binding effect of the previous decision in the beginning of his opinion is not determinative.  His adherence to *res judicata* was in word only.

The Commissioner's argument fails for yet another reason, grounded more in logic than in law.  Even if the ALJ had adhered to the principle of *res judicata* and determined only that Dismukes' condition had not worsened since the previous denial, he could not simply ignore the previous diagnoses of Anemia.  He would have been required to determine whether her anemia had worsened as well, and the conclusion the court arrives at in this case would have been the same.

[7]     Notwithstanding the fact that Taylor's argument regarding the new records is moot, the records are marginally addressed in a different context *infra*.

completed by a treating physician" and noting what she perceives to be the ALJ's disregard of a limitation specified in an RFC assessment by an employee of the State Disability Determination Services, Taylor contends that the ALJ's conclusion that Dismukes could perform past relevant work is not supported by substantial evidence.  (Doc. # 13).  The Commissioner responds by arguing that the plaintiff failed to prove she was unable to return to previous work. (Doc. # 17, p. 4).

Taylor's initial contention, that the ALJ rejected an RFC assessment by one of Dismukes' treating physicians, is puzzling, to say the least.  The record is devoid of an assessment by a treating physician, and none of Dismukes' medical records from her treating physicians offer any information that could be construed as an opinion on her functional limitations.  Of course, this fact alone, according to Taylor, would require remand because, in her words, the "Eleventh Circuit has held on numerous occasions that the ALJ's fifth step burden must be supported by the residual functional capacity assessment of a treating or examining physician"  (Doc. # 13, p. 4).  Research has revealed no such holding, and Taylor cites only to an opinion issued by the United States District Court for the Southern District of Alabama, *Coleman v. Barnhart*, 264 F. Supp. 2d 1007 (S.D. Ala. 2003), which itself cites to no supporting authority for this holding.

The regulations governing disability determinations state that the ALJ is responsible for assessing a claimant's RFC.  20 C.F.R. § 404.1546 (2005).  While this assessment must be based on "all of the relevant medical and other evidence," for purposes of review by the district court, it need only be supported by "substantial evidence."  *Wilson v. Barnhart*, 284 F.3d 1219

14

(11th Cir. 2002) (discussing the claimant's medical records in detail, failing to note any RFC assessment provided by a source other than the ALJ, and finding nonetheless that the ALJ's RFC assessment was supported by substantial evidence).

After listening to Dismukes testify about her job responsibilities at her hearing, a vocational examiner ["VE"] determined that the work she performed was "titled spot cleaner by the *Dictionary of Occupational Titles*", a finding Taylor does not contest (R. 324). This job is "a light and an entry-level, semiskilled occupation." *Id*. Although the VE noted that she also occasionally performed medium work as a laborer, his assessment was based on the "spot cleaner" job classification (R. 325).

The regulations define light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [,] a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005); *see* **Watson v. Heckler**, 738 F.2d 1169, 1172 (11th Cir. 1984).

The ALJ then presented the VE with a hypothetical 42-year old claimant with a high school education limited to the "light work" exertions and the following limitations: "the person would be able to . . . sit six hours in an eight-hour day, stand or walk six hours, would be limited to only occasional overhead reaching,[8] can never climb ladders or ropes, could

---

[8]  Taylor contends that the ALJ disregarded this limitation, which was reflected on the State RFC assessment. Although his opinion does not specifically recite this limitation, his hypothetical clearly contemplated it. Taylor's assertion that the RFC assessment limited Dismukes' ability to reach in all directions misinterprets the record. Section C of the standard RFC assessment form sets forth a number of broad "manipulative limitations"

occasionally balance, stoop, kneel, crouch and crawl, would have to avoid heights and hazardous machinery and avoid vibration." These limitations precisely reflect the limitations set forth in the State RFC assessment (R. 224-231). The VE testified that with such limitations, the hypothetical claimant could return to work as a spot cleaner (R. 325).

Although in writing his opinion, the ALJ may have overlooked a slight limitation noted on the RFC assessment, this oversight did not result in a finding that conflicted with the VE's determination, which took into account Dismukes' occasional overhead reaching limitation. Thus, the ALJ's error would not require reversal, though, on remand, the Commissioner should exercise more caution when setting forth her RFC assessment.

On remand, Dismukes' RFC assessment may change depending upon the Commissioner's evaluation of her anemia. Therefore, the court does not decide whether the ALJ's assessment is supported by substantial evidence in the record.

### E.   *Dismukes' Anemia*

As Taylor correctly notes, the ALJ failed to mention Dismukes' anemia, though he discusses records that clearly identify this condition (R. 14-23; 116-29; 130-149; 159-208; 213). The regulations require a determination as to the severity of ***all*** of Dismukes'

---

with boxes for the assessor to check (R. 227). Next to the first limitation, "[r]eaching in all directions (including overhead)", the box for "limited" is checked. *Id*. The fifth item in that section states, "Describe how the activities checked 'limited' are impaired." *Id*. In the space provided, the assessor stated, "occ overhead bilat". Thus, the ALJ's decision to include an occasional overhead reaching limitation in his hypothetical is supported by substantial evidence.

impairments. 20 C.F.R. § 404.1520(a)(4); *Williams*, 186 F. Supp. 2d at 1197-99. His failure to evaluate Dismukes' well-documented anemia therefore warrants reversal and remand. *Williams*, 186 F. Supp. 2d at 1197-99.

To the extent the ALJ's opinion could be viewed as an implicit determination that her anemia was not severe, his decision is not supported by substantial evidence. Dismukes' medical records indicate that her anemia, specifically described at one point as "1+ hypchrom[ic]" and "2+ microcyt[ic]" (R. 127), ranged from moderate to severe and gradually worsened. (R. 28, 99, 117, 124, 127, 130-31, 136, 139-41, 143, 157, 161, 199, 207, 213, 219, 220-23); *see* 9 ATTORNEY'S TEXTBOOK OF MEDICINE Ch. 60, ¶ 60.20 (Roscoe N. Gray, M.D., & Louise J. Gordy, M.D., LL.B, eds., 3d Ed. 2003).

Although one of her doctors attributed her condition to blood loss related to her menstruation, some of her other ailments, such as hypertension, are inconsistent with that opinion, and her anemia may have just as likely resulted from a number of chronic diseases. *Id.* at ¶¶ 60.21; 60.70.

Despite being perhaps her most persistent and unquestioned medical condition, in terms of Dismukes' medical records, her anemia is also the most undeveloped. It appears that no tests were performed to ascertain the cause of her anemia until, as later records show, her liver began to fail her.[9] Without a better understanding of the cause of her anemia and how it may

---

[9] These records were submitted to the AC after the ALJ issued his opinion and, thus, constitute part of the administrative record on appeal. *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998). Nevertheless, except in circumstances that are not present in this case, courts in the Eleventh Circuit are limited to reviewing only those records before the ALJ. Nothing precludes the court from referring to the additional records in support of its

have been related to any of her other complaints or whether it might have been symptomatic of a more serious condition, the ALJ could not have made an informed decision regarding the severity of her anemia.  Therefore, even if his oversight could be construed as an implicit determination that her anemia was not severe, evidence in support of that decision is unacceptably lacking.

It is reasonable to expect that, upon further investigation, which will include a review of the entire record,[10] as well as perhaps further medical consultation as may be required under 20 C.F.R. § 1512(e) (2004), the evidence will reveal that her anemia was a severe impairment and was merely the exposed surface of a much more significant, and perhaps disabling, condition (i.e., the proverbial tip of the iceberg).  This is by no means a foregone conclusion; however,  the apparently unconsidered, reasonable possibility compels the court to conclude that the ALJ's error prejudiced Dismukes, and his decision must be reversed and remanded. *See*, *e.g.*, **Johnson v. Barnhart**, No. 04-14581, 2005 WL 1523499, at *4-*5 (11th Cir. June 29, 2005) (remanding a case to the Commissioner when the medical evidence was insufficient to make an RFC determination).

---

conclusion, however, as long as its conclusion is not based on those records.

[10]   Despite the fact that this court may not base its decision on records submitted to the AC, they constitute part of the record and should therefore be considered on remand. *See* 20 C.F.R. § 404.970(b) (2004); *Falge*, 150 F.3d at 1322 (noting that such evidence is part of the record on appeal); **Turner ex rel. Turner v. Barnhart**, Civil Action No. 1:04cv986-M, 2005 WL 1693728, at *4 (M.D. Ala. July 18, 2005); *cf.* 20 C.F.R. § 404.970(b) (2004).

## F.     *Side Effects of Medication*

Taylor contends that the ALJ's failure to address possible side effects of Dismukes' medication was error.  While the ALJ's opinion does not specifically address potential negative side effects that could possibly be attributed to Dismukes' medication, his opinion makes clear that he considered Dismukes' prescriptions and their effects on her impairments to the extent the information was provided (R. 19-20).

Although medicinal side effects are factors the ALJ must consider when evaluating a claimant's "symptoms, such as pain", etc., 20 C.F.R. § 404.1529(c)(3), no regulation, statute or court opinion in this circuit has required the Commissioner to discuss all possible effects a prescription may have on a claimant when there is nothing in the record suggesting medicinal side effects that may be relevant to a disability determination.  *See* ***Passopulos***, 976 F.2d at 648 (holding that the ALJ was not required to "elicit testimony and make findings regarding the effect of . . . prescribed medications" without evidence of the existence of side effects); ***Swindle v. Sullivan***, 914 F.2d 222, 226 (11th Cir. 1990) (holding that the "ALJ's determination that side effects from medication did not present significant problem is supported by substantial evidence" when the claimant did not complaint about side effects and the "record did not disclose any concerns about side effects by the several doctors who examined and treated her").

Dismukes did not complain to her doctors about her prescriptions, and nothing in her medical records suggests she reacted badly to any of them or that any of her treating physicians were concerned about their effects.  On her benefit application, Dismukes initially noted that

19

her medications cause her to have an "upset stomach" (R. 77), and she added "some dizziness" as a side effect to her pain medication just a few months later (R. 82). The judge, however, found that Dismukes lacked credibility. Taylor does not challenge this finding, and it is supported by substantial evidence in the record. Therefore, the ALJ's failure to address them simply was not erroneous, and Taylor's argument is without merit.

## IV.   CONCLUSION

Therefore, it is hereby

ORDERED that the Commissioner's final decision be and is REVERSED and REMANDED, pursuant to sentence four of 42 U.S.C. 405(g), i.e., further deliberation not inconsistent with this opinion. Specifically, the Commissioner is instructed to evaluate the severity of Dismukes' anemia and, accordingly, to reevaluate Dismukes' disability status as the Commissioner's conclusion may require.

Done this 12th day of August, 2005.

    /s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE